UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

BRIAN RUBEL,

          Defendant.

09 Cr. 898 (CS)

## Government's Memorandum of Law Opposing Early Termination of Supervised Release (Again)

JAY CLAYTON
United States Attorney
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Michael D. Maimin
Assistant United States Attorney
- Of Counsel -

## Table of Contents

I.    Preliminary Statement ........................................................................... 1

II.   Background ........................................................................................... 3

      A.    Offense Conduct ................................................................. 3

      B.    Indictment and Original Sentence ....................................... 4

      C.    Rubel's Violations of the Terms of His Supervised Release ................... 5

      D.    Rubel's *Anders* Brief, the Second Circuit's Remand, and Rubel's
            Resentencing ...................................................................... 8

      E.    Rubel's Appeal of His Sentence .......................................... 12

      F.    Rubel's Initial Adjustment to Supervised Release.............................. 13

      G.    Rubel's 2024 Motion for Early Termination of Supervised Release
            .......................................................................................... 15

      H.    Rubel's Most Recent Motion for Early Termination ........................... 17

      I.    Rubel's Adjustment to Supervised Release Since This Court Last
            Denied a Motion for Early Termination.............................. 19

III.  Argument............................................................................................ 20

      A.    Applicable Law .................................................................. 21

      B.    Discussion......................................................................... 27

IV.   Conclusion ......................................................................................... 34

## I.    Preliminary Statement[1]

This Court has decided four times now that Brian Rubel—a serious sex offender—merited a lifetime term of supervised release, both when it originally sentenced him in 2010, when it sentenced him for violating the conditions of his supervised release in several troubling ways in 2016, when is resentenced him for those violations in 2018, and when it denied his motion for early termination of supervised release 18 months ago, at the end of 2024. Rubel now asks this Court—again—to terminate his term of supervised release, telling the Court—again—that "he has cared for others, improved his relationship with his family, formed new goals, and achieved new milestones." (Dkt. 55 at 1). Additionally, before his prior motion, his psychologist closed down the practice where he saw Rubel, and told this Court that he did not think that Rubel needed further therapy. (Dkt. 51, Ex. A). That same psychologist—who has, apparently, not seen Rubel since he last wrote the Court, reiterates what he told the Court a year-and-a-half ago. (Dkt. 55, Ex. A). Among other things, that psychologist tells the Court—from what he saw a year-and-a-half ago—that Rubel "did not display an interest in drinking … or pursuing prior paraphilic

---

[1] Much of this brief—including the preliminary statement and background—is similar to, and often lifted from, the Government's prior memorandum of law opposing early termination of supervised release. (Dkt. 53). This is because, as discussed herein, most of Rubel's background and many if not most or all of the reasons his supervised release should not be terminated are the same now as they were 18 months ago, when this Court last denied his motion for early termination of supervised release.

interests—basically BDSM[2] subjects." (Dkt. 55, Ex. A). Finally, Rubel tells this Court that "his Probation Officer, Alecia Ogir, … takes no position on his motion for early termination," and that he has "complet[ed] … his rehabilitative goals." (Dkt. 55 at 1).

Except that is all quite wrong. Ms. Ogir opposes Rubel's motion for early termination,[3] and explains that Rubel: (1) has not completed his rehabilitative goals; (2) is currently in the midst of reevaluation for sex offender treatment and mental health therapy, where she suspects the clinicians will recommend that Rubel reenter sex offender treatment and mental health therapy; and (3) continues to engage in a BDSM lifestyle with his latest girlfriend. Moreover, despite Rubel's prior psychologist's claim that Rubel "did not display an interest in drinking" (Dkt. 55, Ex. A), Rubel admits to this Court that his relationship with his latest girlfriend (who herself has sufficient stability issues that she does not have custody of her own child) revolves around, among other things, "grabbing drinks at local bars" (Dkt. 55 at 6).

Given Rubel's history—including violations of supervised release in the past as well as attempts to hide his activities—the likely need for additional sex offender therapy, this Court's recent decision to deny his motion for early termination, and

---

[2] BDSM stands for "bondage, discipline, sadism, and masochism." (Dkt. 53 at 12 n.5).

[3] Ms. Ogir explained that she has never spoken with Rubel's attorney about early termination, and the closest she has gotten was to tell Rubel himself that she cannot prevent him from asking the Court for such relief.

Rubel's lack of candor with this Court, this Court should not terminate his term of supervised release early.

## II.    Background

Given the nature of Rubel's offense and procedural history—and how that offense and procedural history informs this Court's decision today—it makes sense to discuss them.

### A.    Offense Conduct

In 2008 and 2009, Rubel downloaded videos and pictures from the internet showing minors engaged in sexual conduct, often using "incest" as a search term to find files. (PSR ¶¶ 7(a) & (b), 11). Videos of child pornography—including sex involving prepubescent children—that he maintained on his own computers included such filenames as "XXX—Incent-5yo raped, hymen penetrated-kiddy little girl young porn real child sex baby pedo," "T-28313051-pedo—11 year old kids having sex.mpg," and "10 yo KAJR@YGOLD BABY RAPE—PLEASE SHARE!!! Clip.mpg." (PSR ¶ 10(a), (d), & (e)).

Rubel did not adjust well to pre-trial supervision. Among other things, he was unfavorably discharged from two different residential treatment providers: in one, he refused to follow the program's rules; and in the other he ultimately engaged in oral sex and unprotected intercourse with a female patient with "a borderline IQ." (PSR ¶ 45).

### B.    Indictment and Original Sentence

On September 22, 2009, a grand jury in this District returned the Indictment, charging Rubel with receiving and distributing child pornography (Count One), and possession of child pornography (Count Two). Rubel pleaded guilty to possession of child pornography (Count Two) on November 19, 2010. The Probation Office recommended a Guidelines supervised release term of life. (PSR ¶ 69 & at 21; U.S.S.G. § 5D1.2(b)&(c)). Rubel did not object to that portion of the sentence in his sentencing memorandum. (11/15/10 Def. Sent. Letter 1–3). To the contrary, Rubel asserted that "[i]t is very difficult to accurately predict what [his] life might look like in several years," and so simply argued that he "has spent enough time in jail." (11/15/10 Def. Sent. Letter 3). Nor did he object to lifetime supervised release at sentencing; he simply advocated for "many years['] probation with strict conditions and serious treatment." (Dkt. 19 at 11).

After reviewing all the submissions and listening to the parties, this Court sentenced Rubel principally to a term of 66 months' imprisonment, followed by a life term of supervised release, explaining, at length, the reasons it believed lifetime supervised release was appropriate. (Dkt. 19 at 26–27).[4] Among the terms of supervised release, this Court required Rubel to both "undergo a sex-offense-specific evaluation and participate in a sex offender treatment and/or mental health treatment program"

---

[4] This Court also noted that the "probation office always has the option of, at the point they feel it's no longer necessary, reducing the level of supervision or even terminating it." (Dkt. 19 at 27).

and "participate in the Computer/Internet Monitoring program administered by the U.S. Probation Office." (Dkt. 18 at 4; Dkt. 19 at 29–31).

Rubel did not appeal his sentence.

### C.    Rubel's Violations of the Terms of His Supervised Release

On August 5, 2015, Rubel was released from custody and placed under supervised release. (9/8/16 Violation Report at 2). On September 8, 2016, the Probation Office sent this Court a Request for Summons—which summons this Court issued—setting forth four specified violations of supervised release charged by the Probation Office. The Probation Office noted that "Rubel … made an extremely poor adjustment to supervised release." (9/8/16 Violation Report at 2). The Probation Office explained that, first, Rubel had not complied with his court-ordered sex-offender treatment and was belligerent toward the treatment provider. (9/8/16 Violation Report at 3–4). Second, Rubel had had contact with a child under the age of 18—specifically the seven-year-old daughter of his friend—at least a dozen times, despite having been specifically denied permission to do so. (9/8/16 Violation Report at 4–5). Third, Rubel had loitered within 100 feet of a park primarily used by children, for which a New York City Police Department Officer had issued him a summons. (9/8/16 Violation Report at 6). Fourth, Rubel had not provided truthful information to his Probation Officer

about his use of a Facebook account. (9/8/16 Violation Report at 6). In particular, despite being instructed not to use Facebook, Rubel accessed Facebook over 70 times, using unmonitored, unreported computers.[5] (9/8/16 Violation Report at 6).

In addition to the specified violations, the Probation Office reported more troubling behavior and statements. Among other things: (1) while at a halfway house, before his formal release, Rubel was seen kissing a young female, who he said was 19 years old, but refused to produce identification, stating that "it's nobody's business who he is dating";[6] (2) Rubel admitted that, when he was 19 years old, he had sex with a 16-year-old; (3) Rubel told a therapist that "there's nothing wrong with a 12 or 13 year old having sex with an older person, it's just our society that makes it wrong"; (4) Rubel engaged in aggressive and belligerent behavior with his therapist, including repeated references to "slitting" other people's "throats;" and (5) Rubel lied repeatedly to his Probation Officer both about his sexual relationships with others, and about the fact that he had had repeated contact with a minor despite not being allowed to do so. (9/8/16 Violation Report at 3–5).

On September 14, 2016, Rubel appeared before this Court, and admitted all four specified violations. (9/14/16 VOSR Tr. 1–35). This Court heard the parties that same day about sentencing. Rubel did not directly address the length of any term of

---

[5] Rubel did not challenge the instruction not to use Facebook.

[6] When Rubel later reported to the Probation Office, he brought his girlfriend who showed identification stating that she was, in fact, 19 years old. (9/8/16 Violation Report at 2).

supervised release; rather, he indicated that he understood that a new term of supervised release would be imposed to follow any term of imprisonment (9/14/16 VOSR Tr. 18 ("How many days, how many months should Brian sit in jail for the wake-up call that when he comes out this time, if he continues this pattern, he's going back in for a longer period of time?")), and that he has a "severe, extended, lifetime, emotionally crippling illness" (9/14/16 VOSR Tr. 18).

This Court then sentenced Rubel principally to 12 months' imprisonment, to be followed by the same life term of supervised release, with the same standard and special conditions that it had imposed at Rubel's original sentencing, including the sex offender treatment condition and the computer monitoring condition, explaining her reasons in detail. (9/14/16 VOSR Tr. 21–30). Specifically, this Court found Rubel's violations to be "serious," "troubling," and "alarming," and noted that his actions and statements undermined his purported remorse that he expressed at his initial sentencing. (9/14/16 VOSR Tr. 22). This Court found Rubel to be manipulative and untrustworthy and to have "dangerous ideas" from which the public required protection. (9/14/16 VOSR Tr. 22–24). This Court concluded that it had "zero confidence that Mr. Rubel, given the opportunity, would refrain from either repeating the offense of conviction or doing something worse." (9/14/16 VOSR Tr. 24–25).

Rubel did not object to the lifetime term of supervised release.

### D.    Rubel's *Anders* Brief, the Second Circuit's Remand, and Rubel's Resentencing

Rubel timely appealed. His appellate counsel filed a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967), stating that, after reviewing the record, counsel had concluded that there were no meritorious or non-frivolous issues to be raised on appeal, and moved to be relieved as counsel. The Government agreed and moved for summary affirmance. The Second Circuit denied the motions, ordering the parties to:

> address whether [Rubel]'s special supervised release condition requiring his participation in the "Computer/Internet Monitoring program" prohibits him from gaining access to social media or the internet and, if so, whether the prohibition involves a greater deprivation of liberty than is reasonably necessary for the purposes of sentencing.

With the Government's consent, Rubel moved for remand "for further proceedings concerning" the Computer Monitoring Condition, explaining that:

> the record fails to provide the information necessary to respond to the Court's question. It does not provide a reason for the special condition of Rubel's participation in Probation's "Computer/Internet Monitoring Program." Nor does it provide any information to the scope of the program or how it is to be implemented.

Accordingly, the Second Circuit remanded the case, ordering:

> On remand, the parties and the Probation Office shall supplement the record and the district court shall clarify whether the "Computer/Internet Monitoring program" condition prohibits [Rubel] from accessing social media or the internet or both. If it does include such a prohibition, the parties shall brief, for the district court's consideration, and the district court shall determine, whether the prohibition "involves no greater deprivation of liberty than is reasonably necessary." *See United States v. Dupes*, 513 F.3d 338, 343-44 (2d Cir. 2008) (internal quotation marks omitted).

8

> If the district court decides to retain all or part of the "Computer/Internet Monitoring program" condition or to modify the condition, it should explain its reasoning so as to permit appellate review. *See Packingham v. North Carolina,* 137 S. Ct. 1730, 1736–38 (2017); *United States v. Johnson,* 446 F.3d 272, 281–83 (2d Cir. 2006); *United States v. Sofsky,* 287 F.3d 122, 126–27 (2d Cir. 2002).

On November 13, 2017, this Court held a conference to address this Court's remand order. At that time, this Court noted that *Packingham* dealt with North Carolina's prohibition—applicable to sex offenders—on the use of social media, and compared that to the "description of the Computer/Internet Monitoring program, [which] just allows Probation to monitor." (11/13/17 Conf. Tr. 6). The Probation Officer responded that, "[a]ccording to the wording of the condition and our contract that we have clients sign, social media use is not necessarily prohibited. Through the contract use, we do require prior approval from our office before they access various social media sites." (11/13/17 Conf. Tr. 6). This Court indicated its concern about the Probation Office's authority to impose that restriction on a supervisee. (11/13/17 Conf. Tr. 6).

In particular, this Court noted that it was "concerned if in fact there is a possibility of some sort of blanket prohibition on social media," because "[i]t's one thing to say … 'you can't go on the site of … a group that thinks it's okay to have sex with children,' it's another thing to say, 'you can't be on the Internet at all,' or … 'you can't be on Facebook at all.'" (11/13/17 Conf. Tr. 8). This Court explained that "there's two sort of levels of concern here: One is, you know, where the authority comes from to restrict it, and then the other is, on the facts of a particular case, is there a basis to

restrict it, and[,] if there is, whose call that is." (11/13/17 Conf. Tr. 10). This Court went on to note that, when it imposed the condition, it intended to impose a monitoring condition, not a restriction on access to the Internet or Facebook. (11/13/17 Conf. Tr. 10–11). While a blanket or more tailored restriction could be appropriate—for example, to prevent relapses or to protect the public—such restrictions would have to be justified and the Court would have to make appropriate factual findings. (11/13/17 Conf. Tr. 11). The Court thereafter asked the parties to address whether any restrictions had to be specified by the District Court or whether the Probation Office could be given the discretion to specify such restrictions, and, in either case, what individualized findings had to be made. (*Id.*). As a practical consideration, the Court observed "it's going to be pretty hard for judges to … make site-by-site or social media platform by social media platform decisions about what a given defendant should or should not be looking at." (11/13/17 Conf. Tr. 12).

After significant discussion among the parties and the Probation Office, and multiple submissions to, and arguments before, the Court, the Court imposed a new sentence.

The parties appeared before the Court on August 17, 2018, so that it could amend Rubel's terms of supervised release. At that proceeding, Rubel raised concerns that, of the Government's proposed categories of websites for which Rubel would have to check with his probation officer before accessing the website for the first time, the categories "downloads," "download media" and "webmail" were too broad. (8/11/18 Sent. Tr. 2–4). But, after this Court and the Government explained that Rubel would

10

simply have to notify the Probation Office once so the Probation Officer could confirm that the website (or application) did not run afoul of the terms of supervised release —for example, that a mail server could be monitored or a media download site such as iTunes did not offer otherwise-prohibited materials—and then Rubel could use that website freely (Dkt. 50 at 4–6), Rubel did not further object (Dkt. 50 at 7 ("I understand what the government is saying ….")). Rubel also argued that the monitoring condition was overbroad, and that the Probation Office had excessive discretion to block certain applications. (Dkt. 50 at 7–11). This Court ultimately explained that the Probation Office did not have the discretion to block any applications that were not otherwise prohibited by the terms of supervised release (Dkt. 50 at 11), and that monitoring was necessary in light of Rubel's history (Dkt. 50 at 16–17). Accordingly, this Court, explaining its reasons in detail, withdrew the prior treatment and computer/ internet monitoring conditions, and replaced them with the seven conditions that the Government had proposed—four of which had drawn no objections—including the "specif[ied] categories of websites that are off limits or need pre-approval" that Rubel had requested and the Government had proposed. (Dkt. 45 at 6–6A; Dkt. 50 at 11– 24). In connection with the pre-approval condition, the Court required the Probation Officer to approve Rubel's use of websites or applications unless otherwise barred within three business days. (Dkt. 50 at 22.).

The Court also noted that it "d[id]n't know if this has to be a full resentencing," and therefore, out of an abundance of caution, stated that, "to the extent it does," she

was resentencing him as she had sentenced him previously, but with the amended provisions; *i.e.*, it re-imposed a lifetime term of supervised release. (Dkt. 50 at 24).

### E.      Rubel's Appeal of His Sentence

Rubel appealed his sentence, arguing both that the lifetime term of supervised release was substantively unreasonable and that four of the special conditions that this Court imposed—the monitoring condition, the access condition, the treatment provider condition, and the social media condition—were inappropriate. The Second Circuit affirmed the sentence in a summary order. *United States v. Rubel*, 823 F. App'x 1 (2d Cir. 2020). Relevant here, with respect to the lifetime term of supervised release, the Second Circuit explained:

> Rubel's primary contention is that the District Court "never adequately explained why a lifetime term of supervised release is warranted." … But the court provided ample reasons for the sentence it imposed, including that Rubel presents "a high risk of recidivism and danger to the community." …. We therefore have little difficulty concluding that the District Court did not commit procedural error—plain or otherwise—in sentencing Rubel.
>
> Nor do we find the sentence imposed to be substantively unreasonable.⁕ Indeed, as we noted, not only does a lifetime term of supervised release lie within the recommended Guidelines range for defendants like Rubel, the Guidelines expressly suggest that courts impose such a term in cases like this one, where the "offense of conviction is a sex offense." … Although we will not "presume that a Guidelines sentence is reasonable, we have recognized that in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." … We have reasoned along these lines in affirming the imposition of lifetime terms of supervised release in cases involving misconduct that closely parallels Rubel's, such as simple possession or receipt of child pornography.

12

> *See, e.g.*, *United States v. Brown*, 360 F. App'x 189, 190–92 (2d Cir. 2010) (restating Congress's finding "that the high rate of recidivism of sex offenders does not decline with age" as support for the conclusion that a lifetime term of supervised release was substantively reasonable where the defendant had been convicted of possession of child pornography); *United States v. Raftopoulos*, 254 F. App'x 829, 830–31 (2d Cir. 2007) (finding "that the district court's imposition of lifetime supervised release was reasonable" where the defendant had been convicted of receiving child pornography and "[m]oreover," the record contained evidence of the defendant's "ideation" about unlawful sexual activities, including "fantasizing about having sex with [minors]"). Thus, given the nature of Rubel's crime; his violation of both the terms of his bail and, later, of the conditions of his supervised release; and the District Court's findings with respect to his personal characteristics, we cannot say that this component of Rubel's sentence is "shockingly high … or otherwise unsupportable as a matter of law." … We therefore conclude that the District Court did not abuse its discretion in imposing a lifetime term of supervised release.

*Id.* at 4–5. The Second Circuit noted, as this Court had, "that Rubel may, in the future (and presumably after a period of time in which he has been in compliance with the applicable conditions), apply to the District Court to terminate his supervised release." *Id.* at 5 n.4.

## F.    Rubel's Initial Adjustment to Supervised Release

Despite telling this Court in late 2024 that he has "excelled during the past seven years of supervision" (Dkt. 51 at 2), and that, "[u]pon revocation, Mr. Rubel realized he had to put forth full effort on supervision or he would be spending the next several years in prison" (Dkt. 51 at 3), Rubel had problems with supervision, as this Court is aware from a status report filed with the Court on November 16, 2021. In particular, Rubel was released to supervision on September 13, 2017. As this Court

knows, Rubel needs to stay away from the so-called "BDSM" lifestyle. (11/16/21 Status Report 3).[7] And yet, on July 13, 2021, the Probation Office searched Rubel's "new residence," and found "a pair of bondage stocks for hands and feet." (11/16/21 Status Report 3). Rubel told the Probation Office that they were "old stocks and he no longer used them." (11/16/21 Status Report 3). Not only was this difficult to believe on its face, but it was impossible to believe given that the Probation Office searched a "new residence." (11/16/21 Status Report 3). Not surprisingly, on July 27, 2021, CrimeStoppers received an anonymous tip that Rubel was actively engaged in the BDSM community, specifically "Bedlam" events. (11/16/21 Status Report 3). While Probation told this Court that it was unable to corroborate that tip, it fit in perfectly with Rubel keeping stocks at his new home.

Additionally, the reason that Rubel was in therapy with Dr. Berrill was that he was unable to progress with a different therapist. (11/16/21 Status Report 3). Indeed, the Probation Office reported that "a note from February 12, 2020 indicates his lack of compliance with his treatment appointments and minimizing his need for medication were interpreted as attempts at manipulation and resulted in the denial of Rubel's request to travel to Vermont for a ski trip."

---

[7] The Probation Office erroneously stated that "BDSM" stands for "Bondage and Discipline, Dominance and Submission." (11/16/21 Status Report 3). It actually stands for "bondage, discipline, sadism, and masochism." https://www.merriam-webster.com/dictionary/BDSM.

Finally, Rubel continued to use secret unmonitored devices. The Probation Office noted that, in March 2020, "2 unmonitored devices were confiscated from his residence and that he admitted to having another unmonitored device without permission at that time (a laptop for a period of apx a week)." This was, of course, consistent with the 2021 anonymous tipster's allegation that Rubel "has a secondary cellphone that is unmonitored" (11/16/21 Status Report 3), even if the Probation Office was unable to find it.

### G.    Rubel's 2024 Motion for Early Termination of Supervised Release

On October 18, 2024, Rubel asked this Court to terminate his term of supervised release. (Dkt. 51). Among other things, Rubel attached a letter from his therapist, Dr. Berrill, stated:

> Mr. Rubel's current thinking and behavior has led this clinician to recommend to his PO [probation officer] that h[e] has reached maximum benefit in his SO [sex offender] treatment. Further, there is no indication that Mr. Rubel currently behaves in a reckless, inappropriate, or sexually provocative manner at this time in his life. As such it is anticipated that his treatment will be concluded.[8]
>
> Finally, I am aware that Mr. Rubel is interested in returning to Court in order to modify the duration of his probation. Given his excellent progress and the many years he has spent on probation, I am supportive (clinically speaking) of his being able to receive an early termination from his supervised release.

(Dkt. 51, Ex. A at 2).

---

[8] Dr. Berrill did not explain that treatment would conclude because he was shutting down his practice in Brooklyn. (Dkt. 55, Ex. A).

15

Rubel asked this Court to terminate his supervision early in order to "permit Mr. Rubel to visit extended family in New Jersey, Arizona, and California without Court permission" and to "find a new job that does not require standing on his feet all day." (Dkt. 51 at 4). Rubel also told this Court that he "is fully aware that he may need to return to therapy at some point in the future" and that "[h]e is committed to doing so as needed, but feels stable now." (Dkt. 51 at 4). Rubel concluded: "Given the myriad successes detailed above, supervision has accomplished its rehabilitative objectives: Mr. Rubel has maintained a job, engaged fully and thoughtfully with therapy, developed trusting relationships with his providers, and renewed familial relationships. Most importantly, he has not recidivated." (Dkt. 51 at 5).

After the Government opposed early termination in a lengthy and detailed memorandum (Dkt. 53), this Court denied Rubel's motion on November 18, 2024, explaining:

> The motion is denied essentially for the reasons stated by the Government. Mr. Rubel had problems on supervision from the time of his arrest through 2021. While he is to be commended for the progress he seems to have made in the last three years, the seriousness of his offense, his history of manipulative behavior, and the need for specific deterrence all counsel against a reduction at this time. I am not at all confident that Mr. Rubel would remain law-abiding if he were not in treatment and were free of the possible consequences of violating his conditions of supervised release. Moreover, his desire for travel can be accommodated by obtaining permission from Probation, which is hereby authorized to permit travel in its discretion, and he is likewise free to seek new employment.

(Dkt. 54). One issue that the Government highlighted in its memorandum—upon which this Court relied—was Rubel's "need[] to stay away from the so-called 'BDSM'

16

lifestyle" (Dkt. 53 at 12) and Rubel's apparent inability to do so, and lies to the Probation Office in an attempt to cover up his return to that lifestyle (Dkt. 53 at 12, 19).

## H.    Rubel's Most Recent Motion for Early Termination

On May 6, 2026—less than a year-and-a-half after this Court denied Rubel's motion for early termination, Rubel again moved for early termination. (Dkt. 55). Rubel attaches a new letter from Dr. Berrill to his latest motion, although the letter provides no new information; indeed, it does not indicate that Dr. Berrill has even seen Rubel since he wrote his last letter. (Dkt. 55, Ex. A). Dr. Berrill instead tells the Court, once again:

> I saw [Rubel] in individual therapy for approximately three or more years. When I decided to close our Brooklyn office in October 2024, I let his PO know that he had reached maximum benefit in treatment and that there was no need to reassign him to continue SO [sex offender] treatment.
>
> * * *
>
> By the conclusion of treatment, [Rubel] was working full time, was living with his girlfriend in Brooklyn, and did not display an interest in drinking, using recreational drugs or pursuing prior paraphilic interests—basically BDSM subjects. In fact, he was able to verbalize an understanding that his previous and vocal interest in BDSM reflected an adolescent-like bid for attention. He never displayed an interest, sexually speaking, in underage males or females.
>
> Given the significant progress made in treatment by Mr. Rubel, there is no reason to believe that he could not be successfully terminated from supervised release status. He does not pose a threat to either himself or the community and at this juncture, he has participated successfully in many years' treatment and thus, there is no reason to believe that ongoing SO [sex offender] treatment must be established as a necessary factor for Mr. Rubel to successfully

17

reintegrate into society without being on Federal Proba-
tion.

(Dkt. 55, Ex. A). Rubel relies in large part on Dr. Berrill's letter—revised but not up-
dated from his prior letter—to the Court. (Dkt. 55 at 1–2, 4, 7–8).

Rubel also tells the Court—much like he did last time—that he has generated
strong familial relationships (Dkt. 55 at 5 ("[h]is family and loved ones have wit-
nessed genuine growth in him over the years")), he wants a new job and is afraid that
the strictures of supervised release make it difficult to get one (Dkt. 55 at 5), he "is
pursuing a serious future with his current partner"[9] (Dkt. 55 at 6), he "has fully taken
accountability for his past actions"[10] (Dkt. 55 at 7), and he is "entirely capable of liv-
ing a lawful, structured life" and "demonstrates more than enough discipline to avoid
risky situations and remain lawful without supervision" (Dkt. 55 at 4) and "is no
longer in need of treatment" (Dkt. 55 at 7). Rubel's conclusion is similar to that 18
months ago:

> There is no further rehabilitative benefit to keeping Mr.
> Rubel on supervision. Mr. Rubel is no longer receiving

---

[9] This is a different girlfriend than the girlfriend with whom he lived and with whom
he was trying to "consider[] how, if at all, to continue the relationship" last time
around. (Dkt. 51 at 3).

[10] Even while telling this Court that he "has fully taken responsibility for his past
actions" (Dkt. 55 at 7), Rubel significantly downplays his 2016 violations (Dkt. 55 at
3 ("Nearly a decade ago, in 2016, Mr. Rubel received violations for unreported contact
with a minor child. The contact was only ever accidental, brief, and the mother of the
child involved … was and continues to be a close friend of Mr. Rubel."), 4 ("Mr. Rubel's
2016 violations were mistakes which should be understood within the context of his
good-faith attempt to abide by his restrictions.")),  and claims that, "[a]fter 2016, Mr.
Rubel has complied with his conditions for nearly a decade without significant issues"
(Dkt. 55 at 4), which this Court knows not to be true (*see* pp. 13–15, above).

18

treatment, and his psychologist has said confidently that "there is no reason to believe that he could not be successfully terminated from supervised release status." … His friends and family, who have witnessed his growth as well, are in support of his early termination. His father writes "His psychiatric problems caused significant issues which led to him appearing in front of you years ago. These issues are not there any longer … My support is unwavering as deep down I do believe in his heart—a good soul!" … His loved ones wish to see him thrive in ways that he can't currently achieve with his conditions. … Most importantly, at this point, supervised release is serving no benefit to either public safety or Mr. Rubel.

Today, Mr. Rubel lives a quiet, lawful life and is eager to move on to the next chapter of his life. In light of the newly established criteria under U.S.S.G. § 5D1.4, as well as his personal transformation over the years, Mr. Rubel no longer requires rehabilitative benefits of supervised release. For these reasons, we respectfully request that this Court grant his motion and terminate his supervised release.

(Dkt. 55 at 8–9).

## I.    Rubel's Adjustment to Supervised Release Since This Court Last Denied a Motion for Early Termination

According to Rubel's current probation officer—Alecia Ogir—Rubel has been out of sex offender treatment for two years, primarily because his prior vendor (Dr. Berrill) closed down treatment two years ago. Rubel has a new girlfriend who is significantly younger than he is (approximately 14 years younger), and is quite unstable: so much so that she does not have custody of her own child (who is living with the new girlfriend's ex-husband's mother). Rubel has been engaging in a great deal of BDSM with at least his new girlfriend.

19

As Rubel knows, he is being reevaluated for sex offender and mental health treatment. The reevaluation process is multi-step; Rubel has completed the first two portions of that reevaluation. While Ms. Ogir cannot say for sure what her final recommendation will be until after the reevaluation has been completed, at this time she thinks it highly likely that she (and the provider) will recommend that Rubel engage in both sex offender treatment and mental health treatment as well.

Rubel has told Ms. Ogir that he wants to get off supervision so that he can marry his current girlfriend and have a child with her who he would raise, and otherwise move on with his life. Ms. Ogir told Rubel that she cannot stop him from applying for early termination, but Ms Ogir has never told Rubel that she supports or even takes no position regarding such an application (nor has Ms. Ogir spoken to Rubel's attorney about Rubel). Rather, Ms. Ogir opposes early termination of supervised release.

## III.    Argument

As the Government stated 18 months ago (Dkt. 53 at 13):

> While Rubel should be proud of the accomplishments his attorney lists in her letter to the Court, they simply do not counsel for early termination of supervised release. If anything, if accurate,[11] these accomplishments show that supervised release is working for Rubel, and should not be abandoned now.

---

[11] Given Rubel's prior attempts to hide evidence of his violations, it would not be unreasonable for this Court to take Rubel's assertions of compliance with a grain of salt.

20

Rubel has, effectively, added nothing to the mix, other than his former psychologist repeating what he said in October 2024 based on what he saw in October 2024. Indeed, the only real changes have been that Rubel has moved on to a different girlfriend, Rubel may well need sex offender and mental health treatment again (after Dr. Berrill discharged him), and Rubel has effectively deceived Dr. Berrill by persuading him that Rubel was no longer interested in BDSM or alcohol, which is untrue.

Despite Rubel's statement otherwise (Dkt. 55 at 1), Rubel's probation officer opposes early termination. The Government opposes early termination. And the reasons this Court gave for denying early termination 18 months ago continue to militate for that conclusion.

### A. Applicable Law

This Court may "terminate a term of supervised release … at any time after the expiration of one year of supervised release … if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." 18 U.S.C. § 3583(e)(1). "Occasionally, changed circumstances—for instance, exceptionally good behavior by the defendant or a downward turn in the defendant's ability to pay a fine or restitution imposed as conditions of release—will render a previously imposed term or condition of release either too harsh or inappropriately tailored to serve the general punishment goals of section 3553(a)." *United States v. Lussier*, 104 F.3d 32, 36 (2d Cir. 1997). In deciding whether to terminate supervised release early, this Court is required to consider:

- "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1);

- "the need for the sentence imposed … to afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B);

- "the need for the sentence imposed … to protect the public from further crimes of the defendant," 18 U.S.C. § 3553(a)(2)(C);

- "the need for the sentence imposed … to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," 18 U.S.C. § 3553(a)(2)(D);

- "the kinds of sentence and the sentencing range established," as set forth in the Sentencing Guidelines, 18 U.S.C. § 3553(a)(4);

- "any pertinent policy statement" issued by the Sentencing Commission, 18 U.S.C. § 3553(a)(5); and

- "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6).

18 U.S.C. § 3583(e)(1) (explaining that a court may terminate a term of supervised release only "after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)").[12]

Additionally, the current Guide to Judiciary Policy sets forth a presumption (though not a requirement):

> At 18 months, there is a presumption in favor of recommending early termination for persons who meet the following criteria:
>
> (1)     The person does not meet the criteria of a career drug offender or career criminal (as described in 28

---

[12] 18 U.S.C. § 3553(a)(7) discusses the need to pay restitution. Because no restitution was ordered here, this factor is irrelevant.

> U.S.C. § 994(h)) or has not committed a sex offense or engaged in terrorism;
>
> (2)  The person presents no identified risk of harm to the public or victims;
>
> (3)  The person is free from any court-reported violations over a 12-month period;
>
> (4)  The person demonstrates the ability to lawfully self-manage beyond the period of supervision;
>
> (5)  The person is in substantial compliance with all conditions of supervision; and
>
> (6)  The person engages in appropriate prosocial activities and receives sufficient prosocial support to remain lawful well beyond the period of supervision.

Guide to Judiciary Policy, Volume 8, Part E, Chapter 3, § 360.20(c). This presumption, notably, does not consider the statutory factors;[13] while the current Guide to Judiciary Policy does not contain any reference to what factors a Court or Probation Officer should take into account in determining whether the presumption is rebutted or supervised release should otherwise be terminated, a prior version did, and those factors are illuminating:

> Officers should consider the suitability of early termination for offenders as soon as they are statutorily eligible. The general criteria for assessing whether a statutorily eligible offender should be recommended to the court as an appropriate candidate for early termination are as follows:
>
> (1)  Stable community reintegration (e.g., residence, family, employment);

---

[13] Needless to say, the statutory factors trump any internal policy statements.

(2)   Progressive strides toward supervision objectives and in compliance with all conditions of supervision;

(3)   No aggravated role in the offense of conviction, particularly large drug or fraud offenses;

(4)   No history of violence (e.g., sexually assaultive, predatory behavior, or domestic violence);

(5)   No recent arrests or convictions (including unresolved pending charges) or ongoing, uninterrupted patterns of criminal conduct;

(6)   No recent evidence of alcohol or drug abuse;

(7)   No recent psychiatric episodes;

(8)   No identifiable risk to the safety of any identifiable victim; and

(9)   No identifiable risk to public safety based on the Risk Prediction Index.

Monograph 109, Guide to Judiciary Policy, Volume 8, Part E, Chapter 3, § 380.10(b).[14] As recently as 2020, the Probation Office used these nine factors to discuss whether a defendant merited early termination of supervised release. *See United States v. Kassim*, No. 15 Cr. 554 (KPF), 2020 WL 2614760, at *1 n.1 (S.D.N.Y. May 22, 2020) ("The Probation Department concurred with the defense in a sealed memorandum dated May 15, 2020. Among other things, it cited an internal monograph, the Guide to Judiciary Policy, which outlines nine criteria for probation officers to consider in determining whether to recommend early termination: (i) stable community

---

[14] A copy of "Monograph 109," which is the earlier version of the policy, is available at http://www.madisonattorney.com/cjablog/Monograph109.pdf.

reintegration (e.g., residence, family, employment); (ii) progressive strides toward supervision objectives and in compliance with all conditions of supervision; (iii) no aggravated role in the offense of conviction, particularly large drug or fraud offenses; (iv) no history of violence (e.g., sexually assaultive, predatory behavior, or domestic violence); (v) no recent arrests or convictions (including unresolved pending charges) or ongoing, uninterrupted patterns of criminal conduct; (vi) no recent evidence of alcohol or drug abuse; (vii) no recent psychiatric episodes; (viii) no identifiable risk to the safety of any identifiable victim; and (ix) no identifiable risk to public safety based on the Risk Prediction Index.").

Moreover, "[a] defendant's faithful compliance with the terms of his supervision does not, by itself, entitle him to modification or termination of his term of supervised release." *United States v. Bouchareb*, 76 F. Supp. 3d 478, 479 (S.D.N.Y. 2014) (Marrero, *J.*). That is because "full compliance with the terms of supervised release is what is expected … and does not warrant early termination." *Id.*; *see also United States v. Gonzales*, No. 94 Cr. 134 (JSR), 2015 WL 4940607, at *1 (S.D.N.Y. Aug. 3, 2015) (Rakoff, *J.*) ("[F]ull compliance with the terms of supervised release is what is expected of [the defendant] … and does not warrant early termination." (internal quotation marks omitted)); *United States v. Medina*, 17 F. Supp. 2d 245, 247 (S.D.N.Y. 1998) (Sweet, *J.*) ("While [the defendant's] post-incarceration conduct is apparently unblemished, this alone cannot be sufficient reason to terminate the supervised release since, if it were, the exception would swallow the rule."). Instead, as numerous courts have recognized, "[c]ourts do not order early termination of supervised release

25

as a matter of course. Rather, such relief may occasionally be justified by new or un-

foreseen circumstances, such as when exceptionally good behavior by the defendant

renders a previously imposed term or condition of release either too harsh or inap-

propriately tailored to serve the general punishment goals of section 3553(a). Excep-

tionally good behavior is not established by mere compliance with the terms of super-

vised release, which is what is expected ... and does not warrant early termination."

*United States v. Stein*, No. 09 Cr. 377 (RPK), 2020 WL 4059472, at \*2 (E.D.N.Y. July

19, 2020) (Kovner, *J.*) (citations omitted).

In the most recent Sentencing Guidelines, the Sentencing Commission made

explicit what was implicit: a district court may terminate supervised release after a

year if it "is warranted by the conduct of the defendant and in the interest of justice"

after a holistic analysis:

> *Early Termination.*—Any time after the expiration of one
> year of supervised release and after an individualized as-
> sessment of the need for ongoing supervision, the court
> may terminate the remaining term of supervision and dis-
> charge the defendant if the court determines, following con-
> sultation with the government and the probation officer,
> that the termination is warranted by the conduct of the de-
> fendant and in the interest of justice. *See* 18 U.S.C.
> § 3583(e)(1).

U.S.S.G. § 5D1.4(b).

> When determining whether to terminate the remaining
> term of supervised release under subsection (b), the court
> may wish to consider such factors as:
>
>> (i)      any history of court-reported violations over
>>          the term of supervision;

26

(ii)     the ability of the defendant to lawfully self-manage (*e.g.,* the ability to problem-solve and avoid situations that may result in a violation of a condition of supervised release or new criminal charges);

(iii)    the defendant's substantial compliance with all conditions of supervision;

(iv)     the defendant's engagement in appropriate prosocial activities and the existence or lack of prosocial support to remain lawful beyond the period of supervision;

(v)      a demonstrated reduction in risk level or maintenance of the lowest category of risk over the period of supervision; and

(vi)     whether termination will jeopardize public safety, as evidenced by the nature of the defendant's offense, the defendant's criminal history, the defendant's record while incarcerated, the defendant's efforts to reintegrate into the community and avoid recidivism, any statements or information provided by the victims of the offense, and other factors the court finds relevant.

U.S.S.G. § 5D1.4, comment. (n.2). Other than setting forth formal procedural requirements that were previously followed anyway ("following consultation with the government and the probation officer," U.S.S.G. § 5D1.4(b)), there is little daylight between the new Guideline and the practices discussed above and previously applied by the Court.

## B.    Discussion

It is entirely clear that merely complying with the conditions of release, maintaining a stable residence, not getting arrested, and attending therapy–as the Court

expected him to do—are not even close enough to merit early termination of supervised release, especially when placed against the background of an egregious offense that puts children at risk, coupled with repeated violations of the terms of bail and of supervision in the past.[15] It is not surprising that, other than a very plain-vanilla description of Rubel's history—he does not even discuss his original crime, severely downplays his violations as "accidental," "brief," and "mistakes which should be understood within the context of his good-faith attempt to abide by his restrictions, which were still new to him at the time"[16] (Dkt. 55 at 3–4), and claims that, "[a]fter 2016, Mr. Rubel has complied with his conditions for nearly a decade without significant issues" (Dkt. 55 at 4), which is false (*see* pp. 13–15, above)—Rubel fails to discuss, much less confront, his lengthy pattern of unchecked conduct, even in the face of incarceration, and why that militates for supervised release.

Moreover, Rubel falsely or misleadingly tells the Court that: (1) "his Probation Officer, Alecia Ogir, … takes no position on his motion for early termination" (Dkt. 55 at 1), when she, in fact, opposes early termination, but was never consulted about her position; and (2) he "is no longer receiving treatment" (Dkt. 55 at 8), when he is, in

---

[15] Once again, much of the analysis in this discussion is the same as last time—often word-for-word—in light of the minimal changes. However, this discussion does now incorporate the few changes that occurred.

[16] It is unclear how Rubel was acting in good faith, making mistakes while attempting to abide by restrictions when, among other things, his Probation Officer explicitly told him he could not have contact with his friend's seven-year-old daughter and yet he did so at least a dozen times (9/8/16 Violation Report at 4–5), or when he accessed Facebook over 70 times, ensuring that it could not be monitored by using unmonitored, unreported computers (9/8/16 Violation Report at 6).

fact, in the middle of reevaluation for both sex offender and mental health treatment, as he well knows.[17] And, rather than seek input from the professionals who are reevaluating him today, Rubel turns to Dr. Berrill, who effectively tells this Court that, 18 months ago, he opined that Rubel needed no more treatment and could be terminated from supervised release—a conclusion that this Court rejected—and, absent any additional information, he has not changed his mind. Moreover, this Court knows that the additional information that Dr. Berrill did not seek might have changed his mind: Dr. Berrill relies upon his observation that Rubel "did not display an interest in drinking … or pursuing prior paraphilic interests—basically BDSM subjects." (Dkt. 55, Ex. A; *see also* Dkt. 55 at 4 (noting that Dr. Berrill's conclusion that Rubel "did not display an interest in drinking, using recreational drugs or prior paraphilic interests" demonstrated his "ability to self-manage and avoid situations that could lead to violations")). Except that this Court knows from Ms. Ogir that Rubel continues his "interest in … prior paraphilic interests—basically BDSM subjects" and from Rubel himself that his relationship with his current girlfriend revolves around "quiet game nights, going out with friends, and *grabbing drinks at local bars*."

---

[17] To be clear, there is no reason to believe that Rubel's counsel knew that these statements were false or misleading. Rather, she was surely acting in good faith reliance upon her client who, this Court unfortunately knows, has acted to deceive all of those around him over and over.

(Dkt. 55 at 6 (emphasis added)).[18] Indeed, his continued engagement in BDSM is particularly concerning given that, in 2021, the Probation Office reported his continued BDSM lifestyle to the Court as a problem (11/16/21 Status Report 3), and just 18 months ago, the Government discussed it extensively (Dkt. 53 at 12, 19), and this Court relied on the Government's arguments in denying early termination, which one would think would incentivize Rubel to distance himself from that lifestyle.[19]

Moreover, Rubel's compliance has been spotty, and indicates a likelihood that he has simply gotten better at covering his tracks. In March 2020, the Probation Office seized two unmonitored devices from Rubel, and Rubel admitted that he had another one. This, of course, was part of the basis of his initial violations. And it is consistent with an anonymous tip that, the following year, Rubel again had a secret, unmonitored cellphone; this time, Rubel learned to hide it well enough that the Probation Office could not find it. That tipster also said that Rubel had reinserted himself in the BDSM community at the same time that he brought BDSM stocks into his "new residence," and wove an unbelievable story that, somehow, he had forgotten about the stocks that made their way into his new home. And, despite soliciting a letter from his former psychologist saying that he was no longer interested in BDSM, Rubel has continued practicing BDSM.

---

[18] Rubel does not tell this Court about how his relationship also revolves around BDSM.

[19] As this Court surely recalls, Rubel lied extensively about evidence of his BDSM lifestyle before. (*See* pp. 13–14, above, and 11/16/21 Status Report 3).

Even if Rubel were to be believed, and, since 2021, he has actually been compliant—and, at this point, there is no reason for such faith—all he would have done "is what is expected … and does not warrant early termination." *Bouchareb*, 76 F. Supp. 3d at 479. To the contrary, the applicable statutory factors—which this Court must consider—counsel overwhelmingly against early termination:

- *[T]he nature and circumstances of the offense and the history and characteristics of the defendant.* Rubel committed serious crimes that indicate predilections that would put children at serious risk. He showed some of the nature of that risk when, while on bail, he engaged in oral sex and unprotected intercourse with a female patient at his residential treatment who had a "borderline IQ," and then, while on supervised release, he failed to comply with treatment and was belligerent toward his provider, had contact at least a dozen times with a seven-year-old girl, despite having been specifically denied permission to do so, loitered within 100 feet of a playground, lied about his use of Facebook (which use was wholly unmonitored and so the Court still has no idea what he was doing that he felt the need to conceal), he was kissing a girl who was likely underage, and he told a therapist that there was nothing wrong with children having sex with adults.

- *[T]he need for the sentence imposed … to afford adequate deterrence to criminal conduct.* The sentence this Court imposed was critical to afford adequate deterrence; Rubel showed himself to be unrelenting, with his continuous violations of both bail and supervised release. Indeed, if anything, his report that, following his term of incarceration for violating supervised release, Rubel finally understood he could no longer violate the rules shows the absolute need for continued supervised release.

- *[T]he need for the sentence imposed … to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.* Even Rubel has told the Court how important and effective his sex-offender treatment is. (Dkt. 51 at 3). It now appears likely that he needs more sex-offender (and mental health) treatment. Supervised release is an important factor in his continued treatment. As for vocational training, Rubel tells the Court that he is doing well as his job, but is "highly motivated to advance in his career." (Dkt. 55 at 5). However, he does not

31

explain why termination of supervision would allow him to get a new job, or how supervision prevents him from seeking better employment, other than generically saying that the "conditions of his supervision limits his employment prospects and undermines Mr. Rubel's ability for normal professional advancement. (Dkt. 55 at 5).[20] If anything, this Court knows that the Probation Officers are extremely good at helping supervisees obtain and maintain fruitful employment.

- *[T]he need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.* Rubel offers no evidence that defendants like him regularly have their supervised release terminated early.

Rubel continues to need desperately the structure of supervision—as well as the therapy that comes with it—to continue his reintegration into society: if anything, whatever successes Rubel seems to have appear to be because of, and not in spite of, his supervision. He likely needs additional sex-offender and mental-health treatment that he gets through supervision. Society continues to need the protection that supervision offers. In short, Rubel has not demonstrated any exceptional or changed circumstances that render the remaining period of supervision "either too harsh or in-

---

[20] Rubel tells this Court that, "[i]n a modern professional environment, waiting up to three days for clearance to download software, access a new email server, or open a webpage is an undeniable hinderance that limits the ability for upward professional growth. Moreover, the burden to disclose his restrictions with his employer creates an unavoidable stigma." (Dkt. 55 at 5). Except that Rubel does not tell this Court of any time that his supervision in fact hindered his "upward professional growth," much less how, if at all, he tried to work that out with his probation officer. Moreover, this complaint is a little rich: had Rubel not tried to hide violative activities dozens and dozens of times by using unmonitored computers—and if he did not continue to try to hide his problems—perhaps the probation office and this Court would be more willing to be flexible about his restrictions.

32

appropriately tailored to serve the general punishment goals of section 3553(a)." *Lussier*, 104 F.3d at 36. Rather, even if he is to be believed, he has done no more than this Court entrusted him to do. As Chief Judge Swain explained in the course of denying a motion for early termination of supervised release in another case:

> While the Court commends [the defendant] for his substantial compliance with the terms of his supervised release, and for making positive contributions to his community, the Court finds that [the defendant] has not identified extraordinary conduct or unforeseen harsh circumstances that warrant early termination of his supervised release. Even though [the defendant's] post-incarceration conduct is unblemished, this alone cannot be sufficient reason to terminate the supervised release. After all, full compliance with the terms of supervised release is what is expected of him and all others serving terms of imprisonment and supervised release and does not warrant early termination."

*United States v. Sweat*, No. 16 Cr. 269 (LTS) (S.D.N.Y.), Docket Entry 9 at 2–3 (Feb. 4, 2020) (Swain, *C.J.*) (internal quotation marks and citations omitted). The same holds true in this case. Indeed, if mere compliance with the terms of supervised release were enough to merit early termination—irrespective of the nature and circumstances of the offense—supervision would be granted in many, if not most, cases.

This Court denied Rubel's request for early termination of supervised release just 18 months ago. As this Court said:

> Mr. Rubel had problems on supervision from the time of his arrest through 2021. While he is to be commended for the progress he seems to have made in the last three years, the seriousness of his offense, his history of manipulative behavior, and the need for specific deterrence all counsel against a reduction at this time. I am not at all confident that Mr. Rubel would remain law-abiding if he were not in treatment and were free of the possible consequences of violating his conditions of supervised release.

33

(Dkt. 54). Those reasons all ring as loudly today as they did 18 months ago and mili-

tate for the same conclusion.

## IV.    Conclusion

This Court should deny Rubel's motion for early termination of his term of su-

pervised release.

Dated:    New York, New York
          June 5, 2026

                                        Respectfully submitted,

                                        JAY CLAYTON
                                        United States Attorney
                                        for the Southern District of New York

                       By:    _____
                                        Michael D. Maimin
                                        Assistant United States Attorney
                                        Tel.: (212) 637-2340

34